**UNITED STATES of America, Plaintiffs,**

v.

**Lewis Alexander PELTIER, Defendant.**

**No. 03–20032–BC.**

United States District Court, E.D. Michigan, Northern Division.

Oct. 26, 2004.

Michael J. Hluchaniuk, U.S. Attorney's Office, Bay City, MI, for Plaintiff.

*OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS*

LAWSON, District Judge.

The defendant, Lewis Alexander Peltier, is charged in a five-count indictment with various controlled substance and firearms offenses. The violations were discovered when Michigan State and local police officials executed a search warrant at the defendant's residence, which is located within the boundaries of the Saginaw Chippewa Indian reservation. The defendant is a member of the Little Traverse Bay Ottawa Indian Tribe, and he has filed motions to quash the search warrant and suppress evidence on the grounds that the State warrant to search premises within Indian Country was invalid and the warrant was based on information illegally obtained by the police. He also claims that the federal court has no jurisdiction to entertain this prosecution because the crimes charged in the indictment are not enumerated in the Indian Major Crimes Act, 18 U.S.C. § 1153. Finally, the defendant has moved to suppress a confession on the ground that he was suffering from drug withdrawal when he made his statements. The Court held an evidentiary hearing on August 26, 2004, allowed the parties time to submit supplemental briefs, and the matter is now ready for decision. The Court finds that it has jurisdiction over the matter, the confession was not obtained in violation of the defendant's rights under the Due Process Clause, the police did not act improperly in obtaining

the search warrant, and the state court did not have authority to issue the search warrant to search premises within Indian Country. Therefore, the Court will grant the motion to suppress the evidence and deny the motion to suppress the statement.

## I.

Based on the testimony presented, it appears that there is little dispute as to the facts. Harry Norman, a Michigan State police detective assigned to the Bay Area Narcotics Enforcement Team, known as "BAYANET," testified that in December 2002 his unit was engaged in a large-scale investigation involving drug trafficking in Isabella County. He said that the defendant's name was connected with this investigation. Coincidently, that same month Richard Walter, the owner of an Isabella County trailer park, contacted the State police expressing concern over suspicious activity that had occurred during November and December 2002 at his complex. The activity included heavy vehicle traffic, and Walter recorded license plate numbers. The trailer complex is located within the Saginaw Chippewa Indian reservation.

Walter and Norman met with Michigan State police detective lieutenant Daniel King, also assigned to BAYANET, and formulated a plan that targeted the defendant's residence. Walter explained that every quarter he took water samples from the residences for testing. King proposed that he would pose as Walter's assistant and enter the premises after obtaining consent of the tenants to conduct the water sampling. At approximately 2:30 p.m. on December 9, 2002, Walter and King went to the defendant's residence. The door was answered by Ajaina Keshick who was a female the park owner knew to be Mr. Peltier's girlfriend and to be residing with him in that unit. Keshick's name appeared on the documents relating to the mobile home unit as someone occupying the premises. The park owner asked to speak with Mr. Peltier, who was not there at the time, and then asked to examine the water. Ms. Keshick then gave permission for the owner and the owner's assistant to enter for that purpose.

While inside the residence, King observed what he believed to be a small quantity of marijuana in one location, a marijuana stem in another location, some rolling papers on the floor, and a firearm in the livingroom area on the floor. King testified that he saw two other individuals inside, and based on his observations he suspected a certain level of criminal activity was taking place on the premises. King and Walter were inside the premises for fifteen to twenty minutes and did not seize any property while there. King did not move any items to gain a better vantage point or seize any property at that time.

King used this information to obtain a search warrant from a State court judge. The warrant was executed at approximately 6:00 p.m. that day by several officers, but the participants did not include any federal agents. The defendant was present when the search warrant was served. The search yielded three firearms, including a .22 caliber Rueger rifle with an obliterated serial number. In addition, ten to fifteen grams of crack cocaine were found on defendant's person, as well as $928 in cash. The police also discovered a police scanner, a surveillance camera set to view the outside of that residence, and a monitor.

The defendant was arrested some time after midnight on December 10, 2000 and made statements to Trooper Norman. Norman testified that after the defendant was given his *Miranda* warnings, he said that he was "stupid" and knew he would

get caught. Thereafter, Norman removed the handcuffs from the defendant, let him smoke a cigarette, and engaged him in conversation. Norman insisted that the defendant did not exhibit signs of drug or alcohol withdrawal and maintained good eye contact. The defendant asked Norman how he could help himself and agreed to make telephone calls to set up a drug deal. However, nothing ever materialized from the defendant's offer. Although Norman testified that he interviewed the defendant only on December 10, 2000, the government's exhibits indicate that there was a tape-recorded interview on December 9 and another interview that continued on December 10.

Norman also testified that the Isabella County prosecutor refused to authorize an arrest warrant for the defendant because the premises on which the arrest occurred was located on tribal land per the Treaty of 1855, so Norman called the tribal court and a warrant for possession of cocaine base was issued and bond was set. Apparently, that case did not proceed in tribal court. On June 18, 2003, a federal grand jury returned a five-count indictment charging the defendant with conspiracy to distribute and possess with intent to distribute fifty grams or more of cocaine base (count one); possession with intent to distribute five grams or more of cocaine base (count two); possession of marijuana (count three); possession of a firearm in furtherance of a drug trafficking crime (count four); and possession of a firearm with the manufacturer's serial number removed or obliterated (count five). The indictment was unsealed on July 16, 2003, and the defendant was arrested on March 19, 2004. On April 13, 2004, the government's request for detention of the defendant was granted. Thereafter, the defendant filed the several motions noted earlier.

## II.

■ Turning first to the defendant's argument that this Court has no jurisdiction to hear this prosecution, the Court notes that the government concedes that the defendant is an Indian and the arrest and search took place within Indian country, as that term is defined by federal law. *See* 18 U.S.C. § 1151 (defining "Indian country" to include "all land within the limits of any Indian reservation under the jurisdiction of the United States Government"). "Criminal jurisdiction over [such] offenses 'is governed by a complex patchwork of federal, state, and tribal law.'" *Negonsott v. Samuels,* 507 U.S. 99, 102, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993) (quoting *Duro v. Reina,* 495 U.S. 676, 680, n. 1, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990)).

The defendant argues that the Court must turn to the Indian Major Crimes Act to determine whether jurisdiction over the offenses lies in federal court. That statute states:

(a) Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury (as defined in section 1365 of this title), an assault against an individual who has not attained the age of 16 years, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

(b) Any offense referred to in subsection (a) of this section that is not defined and punished by Federal law in force

within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense.

18 U.S.C. § 1153. Since the drug and weapons offenses charged in the indictment are not enumerated in Section 1153, the defendant reasons, the Court has no jurisdiction because the offenses took place in Indian country.

The defendant's argument overlooks the Indian Country Crimes Act, however, which states:

> Except as otherwise expressly provided by law, *the general laws of the United States* as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, *shall extend to the Indian country.*
>
> This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

18 U.S.C. § 1152 (emphasis added).

In *United States v. Yannott,* 42 F.3d 999 (6th Cir.1994), the court of appeals stated that when read together, those sections do not deprive the federal courts of jurisdiction to hear cases involving federal criminal laws of general applicability. The court reasoned that Section 1152 and its exceptions "apply only to federal laws where the situs of the crime is an element of the offense." *Id.* at 1004. That section does "not affect the application of general federal criminal statutes to Indian reservations." *Ibid.* Section 1153 applies only to

the crimes listed and specifically is limited to crimes committed by one Indian against another Indian. "[I]t does not strip the federal courts of jurisdiction of those crimes not enumerated therein; in fact, federal courts retain jurisdiction over violations of federal laws of general, nonterritorial applicability." *Ibid.*

The crimes for which Yannott was prosecuted were possession of an unregistered firearm and being a felon in possession of a firearm. The drug trafficking and weapons offenses charged in this case are similar in that none of the charged offenses includes the situs of the offense as an element of the crime. This Court does not lose jurisdiction to adjudicate the prosecution of these crimes merely because they allegedly occurred within Indian country since "federal courts retain jurisdiction over violations of federal laws of general, non-territorial applicability." *Ibid.* The motion to dismiss for want of jurisdiction, therefore, will be denied.

### III.

The defendant argues that the search warrant should be quashed on two grounds: Detective King obtained the supporting information through trickery and improperly entered the defendant's premises the first time without a warrant; and the State court had no authority to issue a warrant to search premises in Indian country.

### A.

■ The parties agree that King's first entry into the premises was achieved without a warrant and would be unlawful absent consent. *See Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (holding that warrantless searches of dwellings are "presumptively unreasonable"); *Schneckloth v. Bus-*

*tamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (noting that consent is "one of the specifically established exceptions to the requirements of both a warrant and probable cause"). If proper consent was lacking, then the information discovered by King while he was present in the premises, even if incriminating evidence was in plain view, could not be used to support the search warrant. *United States v. Hammond*, 351 F.3d 765, 771 (6th Cir.2003) (stating that "[t]he critical question to be determined is whether the affidavit, apart from the tainted information that is either inaccurate or illegally obtained, provides the requisite probable cause to sustain a search warrant").

■ There does not appear to be much dispute over the fact that proper consent for Walter and King to enter to perform the water testing was given by the defendant's live-in girlfriend, Ms. Keshick. Her name was on the rental application as an occupant of the dwelling, and it was reasonable to believe that she enjoyed common authority over the premises. Such a person has authority to consent to entry. *See Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

However, the issue of valid consent becomes somewhat complicated when police officers conceal their identity for the purpose of gaining entry to a premises. The government cites *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), a case in which an undercover officer misrepresented his identity so that he could enter a dwelling to purchase illegal narcotics. The undercover agent was invited into the target's home where the transaction occurred. The Court held that "in detection of many types of crimes, the government is entitled to use decoys and to conceal the identity of its agents." *Id.* at 209, 87 S.Ct. 424. However, the Court's rationale included the characterization of the defendant's "home [being] converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business." *Id.* at 211, 87 S.Ct. 424. Likewise, in the case of *United States v. Guidry*, 534 F.2d 1220 (6th Cir. 1976), the court found no violation of the Fourth Amendment when a government agent posed as a "helper" to a third party asked by defendants to help sell a portion of their printing press and gained entry into the defendant's premises to investigate a counterfeiting operation. The court reasoned that the home became a place of illegal business operations, and the surreptitious entry did not violate the Fourth Amendment.

■ The defendant attempts to distinguish this authority by citing *Gouled v. United States*, 255 U.S. 298, 306, 41 S.Ct. 261, 65 L.Ed. 647 (1921), *overruled on other grounds by Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), and arguing that gaining entry into a person's home by guile such as under the guise of a business call or social visit violates the Fourth Amendment. However, in *Gouled*, the undercover agent not only gained entry into a business by artifice but he also conducted a full-blown, intrusive search while he was there. The rule of the cases cited by the government is consistent with the general proposition that the reasonableness of the police conduct is coextensive with the scope of consent given. *Florida v. Jimeno*, 500 U.S. 248, 251–52, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). That rule applies even when the consent is obtained by trick or artifice. A person who allows another into her private space incurs the risk that the entrant will reveal that which he saw in plane view. That is a peril that is heightened when the entrant is a law enforcement officer, to be sure, but there is no breach of privacy when that occurs. *See Lewis*, 385 U.S. at 210, 212, 87

S.Ct. 424 (stating that the "[defendant] invited the government's agent into his home for the specific purpose of executing a felonious sale of narcotics, defendant's only concern was whether agent was a willing purchaser who could pay agreed price and agent during neither of his visits to defendant's home saw, heard or took anything that was not contemplated, and in fact intended, by [defendant] as necessary part of his illegal business"); *Hoffa v. United States*, 385 U.S. 293, 303, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) (finding no Fourth Amendment violation because the defendant had no expectation of privacy in conversations heard by an invited guest who was in fact a paid government informant).

In this case, Detective King was permitted to enter the premises with Mr. Walter to test the water, and that is what he did. His true purpose for entry was concealed, but he did not move any objects, search any concealed spaces, or engage in any conduct other than observing what there was to see. The State had the benefit of King's trained eye, but the observations just as easily could have been reported by Walter to obtain the search warrant. The Court finds no Fourth Amendment violation in King's activity at the defendant's premises on December 9, 2002.

### B.

■ The defendant's alternate ground for attacking the search presents a different issue not yet addressed by the Sixth Circuit: whether a State judicial officer had the authority to issue a warrant to search premises within Indian country. The government contends that the extent of reservation boundaries in Isabella County is not clear and points to *People v. Bennett*, 195 Mich.App. 455, 491 N.W.2d 866 (1992), in support of its claim. In that case, the state court of appeals held that

certain land within six townships in that county was privately owned prior to the October 18, 1864 and therefore not conveyed to the Saginaw Chippewa Indian Tribe by that treaty and excluded from the reservation. The government contends that the resulting confusion requires that law enforcement personnel pursue their investigations, make their arrests, and sort out questions of jurisdiction later. The government contends in its brief that local law enforcement agencies have entered into agreements with tribal authorities to honor each other's search warrants, but no evidence of any such agreements has been presented to the Court.

■ Although the validity of such agreements with local law enforcement agencies likely is subject to question, a tribe may enter into such agreements with the *States*. *See* 25 U.S.C. § 1321(a). Indian tribes are sovereign entities under the Constitution and federal law. *See e.g. Nevada v. Hicks*, 533 U.S. 353, 358–59, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001); *Montana v. United States*, 450 U.S. 544, 551, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). Before 1871, the relationship between Indian tribes and the federal government was regulated by treaties; the United States recognized that tribes possessed the attributes of a nation. *See United States v. Baker*, 63 F.3d 1478, 1485 (9th Cir.1995). That year, Congress, by statute made tribes amenable directly to the power and authority of United States laws by legislation instead of treaty. *Id.* Nonetheless, a treaty retains the same force and effect as a treaty with a foreign nation; it is the supreme law of the land and may be abrogated by a subsequent act of Congress. *Oregon Dept. of Fish and Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 765–66, 105 S.Ct. 3420, 87 L.Ed.2d 542 (1985). Although Congress now directly regulates Indian tribes, they retain all essential as-

pects of sovereignty. As sovereigns, tribes have the inherent right to regulate conduct occurring within their boundaries and exercise governmental authority over their members. *Hicks,* 533 U.S. at 361, 121 S.Ct. 2304. Thus, tribes have the authority to punish tribal offenders, to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members. *Id.*

 A tribe's sovereignty is generally considered on par with that of the several States. *See e.g. Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 137, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982). As a result, although Indian reservations are located within the territory of the State, States presumptively lack both civil and criminal jurisdiction over tribal members for activities that occur within reservation boundaries. *Hicks,* 533 U.S. at 362, 121 S.Ct. 2304. A State may not prosecute a crime occurring on a reservation where both the victim and perpetrator are tribal members. *See e.g. Bartlett v. Solem* 691 F.2d 420, 421 (8th Cir.1982) (affirming grant of habeas corpus petition on the ground that the state lacked jurisdiction to prosecute a tribal member for an offense committed within Indian Country), *aff'd,* 465 U.S. 463, 467 n. 8, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984); *see also Cheyenne–Arapaho Tribes v. Oklahoma,* 618 F.2d 665, 668 (10th Cir. 1980) (stating that "states have no authority over Indians in Indian Country unless it is expressly conferred by Congress").

 A State may exercise criminal jurisdiction over tribal members on reservations by an express Congressional grant. *See United States v. Baker,* 894 F.2d 1144, 1146 (10th Cir.1990). Likewise, a State may also assert jurisdiction if the State manifests its intent by affirmative political action to assume jurisdiction pursuant to 25 U.S.C. 1321(a). *See State v. Klindt,* 782 P.2d 401, 403 (Okla.Crim.App.1989). However, there is no evidence that Michigan has sought or obtained consent by Congress or its own political affirmation to assert such jurisdiction or that the Saginaw Chippawa Indian Tribe consented to it; criminal jurisdiction over tribal members on the reservation, therefore, is exclusively tribal or federal.

In *United States v. Baker,* the Tenth Circuit held that in the absence of State criminal jurisdiction, a State search warrant issued to search land on an Indian reservation was not valid against a tribal member unless it was issued pursuant to Federal Rule of Criminal Procedure 41 or it was "otherwise 'federal in character.'" 894 F.2d at 1146–47. Under Rule 41, "a judge of a state court of record in the district" has the authority to issue a federal search warrant "[a]t the request of a federal law enforcement officer or an attorney for the government." Fed. R.Crim.P. 41(b)(1). The *Baker* court held that the state-court-issued warrant to search for drug evidence within Indian country was invalid because no federal officers participated in the events "from application for the warrant through its execution," *id.* at 1146, and the warrant was not requested by a federal prosecutor. Since "the search of the defendant's property was not authorized by a valid warrant," *id.* at 1147, the court held that the evidence should have been suppressed.

The same reasoning applies here. The investigation into drug activity in Isabella County was run by a State concept unit: BAYANET. There is no evidence that federal agents participated in the surveillance of investigation of the defendant or his residence. No attorney for the government or government agent requested the State judge to issue the search warrant, and there was no federal involvement in the execution of the warrant. The search

warrant, therefore, was not valid in Indian country.

■ A search warrant signed by a person who lacks the authority to issue it is void as a matter of law. *United States v. Neerng,* 194 F.Supp.2d 620, 627 (E.D.Mich. 2002) (citing *United States v. Scott,* 260 F.3d 512 (6th Cir.2001)). The State judge was not authorized to issue the warrant to search the property within the reservation in this case. The evidence seized pursuant thereto, therefore, must be suppressed.

### IV.

■ Last, the defendant contends his statements to police on December 9 and 19, 2002 should be suppressed as a violation of his rights under the Due Process Clause because he was suffering from drug withdrawal at the time. The testimony of Harry Norman rebuts that contention, but there is a more basic reason that the defendant's motion must be denied: he does not allege that the statements were the product of any police misconduct.

■ The Due Process Clause has been held to reach "certain interrogation techniques, either in isolation or as applied to the unique characteristics" of a criminal defendant." *Miller v. Fenton,* 474 U.S. 104, 109, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). Some "techniques are so offensive to a civilized system of government that they must be condemned." *Ibid.; see also Moran v. Burbine,* 475 U.S. 412, 432–434, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). However, the Supreme Court has held that "coercive police activity is a necessary predicate to finding that a confession is not voluntary within the meaning of the Due Process Clause." *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). The crucial element in due process claims is police overreaching. *Id.* at 164, 107 S.Ct. 515. Although each case involving claims of a coerced confession turns on its own set of factors, cases finding due process violations all have involved a "substantial element of coercive police conduct." *Ibid.* Unless the surrounding circumstances indicate police conduct is causally connected to the confession, "there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Ibid.*

Following *Connely,* the Sixth Circuit established a three-part test to determine whether a confession was involuntary under the Due Process Clause in *McCall v. Dutton,* 863 F.2d 454 (6th Cir.1988). There, the court stated:

> Threshold to the determination that a confession was "involuntary" for due process purposes is the requirement that the police "extorted [the confession] from the accused by means of coercive activity." Once it is established that the police activity was objectively coercive, it is necessary to examine petitioner's subjective state of mind to determine whether the "coercion" in question was sufficient to overbear the will of the accused. Finally, petitioner must prove that his will was overborne because of the coercive police activity in question. If the police misconduct at issue was not the "crucial motivating factor" behind petitioner's decision to confess, the confession may not be suppressed.

*Id.* at 550. The Sixth Circuit has extended that rationale to cases involving drug and alcohol addiction in *United States v. Newman,* 889 F.2d 88, 94 (6th Cir.1989) (holding that "[e]vidence that a defendant suffered at the relevant time from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of

due process; some element of police coercion is necessary").

The defendant has not alleged, nor has the evidence disclosed, an element of police coercion in connection with his statements to Detective Norman. There is no basis to conclude, therefore, that the defendant's statements were obtained in violation of the Due Process Clause.

V.

The Court finds that it has jurisdiction to adjudicate the charges against the defendant. The Court also holds that the police did not act improperly in obtaining the evidence used in support of the search warrant. However, the State court did not have authority to issue the search warrant to search premises within Indian country. Finally, the defendant's statements were not obtained in violation of his rights under the Due Process Clause.

Accordingly, it is **ORDERED** that the defendant's motion to dismiss for want of jurisdiction [dkt. # 18] is **DENIED**.

It is further **ORDERED** that the defendant's motion to suppress his statements [dkt. # 16] is **DENIED**.

It is further **ORDERED** that the defendant's motion to suppress evidence based on the theory of illegal entry [dkt. # 17] is **DENIED**.

It is further **ORDERED** that the defendant's motion to suppress evidence based on the theory that the State judge lacked authority to issue a warrant to search and within Indian country [dkt. # 18] is **GRANTED**.