MOSES v DEPARTMENT OF CORRECTIONS

Docket No. 262970. Submitted December 4, 2006, at Lansing. Decided March 1, 2007, at 9:05 a.m.

Scott W. Moses, who was imprisoned after pleading no contest to one count of third-degree criminal sexual conduct, filed a complaint in the Court of Appeals for a writ of habeas corpus, alleging that the state of Michigan lacked jurisdiction to prosecute him because he was a member of an Indian tribe at the time of the offense and the offense occurred on an Indian reservation. The Court of Appeals proceeded to a full hearing on the merits in the same manner as an appeal of right, and also granted the Isabella County Prosecutor's motion to join the action as a party defendant.

The Court of Appeals *held*:

1. Habeas corpus is an available remedy for a convicted person to assert a radical defect in the circuit court's jurisdiction.

2. The plaintiff's habeas corpus claim fails because the offense occurred not on "Indian land" as designated by the treaties of 1855 and 1864, but on swampland that the United States patented to the state of Michigan before those treaties were signed.

3. The prosecutor may make defensive use of collateral estoppel to prevent relitigation of the Indian Claims Commission's determination that the swamplands at issue were not "Indian land," because that case involved the Saginaw Chippewa Indian Tribe and the plaintiff is claiming rights as a member of that tribe, which gives rise to the requisite privity.

4. Because the plaintiff's complaint is for a writ of habeas corpus and not for civil remedies under 42 USC 1983, his claims under that statute are without merit.

Complaint dismissed.

HABEAS CORPUS — CONVICTED PERSONS — JURISDICTION.

Habeas corpus is an available remedy for a convicted person to assert a radical defect in the circuit court's jurisdiction (MCL 600.4310[3]).

*William L. Antrobius* for Scott W. Moses.

*Michael A. Cox,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Chester S. Sugierski, Jr.,* Assistant Attorney General, for the Department of Corrections.

*Larry J. Burdick,* Prosecuting Attorney, and *Risa Scully,* Senior Assistant Prosecuting Attorney, for the Isabella County Prosecutor.

Before: MARKEY, P.J., and SAAD and WILDER, JJ.

PER CURIAM. In this habeas corpus proceeding, plaintiff challenges the jurisdiction of the Isabella Circuit Court with respect to his conviction of third-degree criminal sexual conduct (CSC), MCL 750.520d(1)(b), because he contends the offense occurred in "Indian country" as that term is defined in 18 USC 1151. Plaintiff asserts that because he is an enrolled member of the Saginaw Chippewa Tribe, and because the offense occurred within the exterior boundaries of the Isabella Indian Reservation as determined by the treaties of August 2, 1855, and October 18, 1864, between the United States and the Chippewa of Saginaw, Swan Creek, and Black River, the jurisdiction over the CSC offense was exclusively federal or tribal. First, we conclude that habeas corpus is an available remedy to assert a radical defect in the circuit court's jurisdiction. Second, we deny plaintiff relief because the offense occurred on so-called "swampland" patented by the United States to the state of Michigan before the treaties of 1855 and 1864; consequently, the situs of the CSC offense was not "Indian country." See *People v Bennett,* 195 Mich App 455; 491 NW2d 866 (1992).

## I. FACTS AND PROCEDURAL HISTORY

This action arises out of plaintiff's November 28, 2001, no-contest plea to one count of third-degree CSC,

pursuant to a plea agreement before the Isabella Circuit
Court. The court used a Michigan State Police report
offered by the prosecutor to find a factual basis for the
plea. The parties agree that the CSC offense occurred in
October 2001, at the home that the complainant and
plaintiff shared at 3560 N. Johnson Road in Isabella
County.[1] The parties further agree that this location is
within the exterior boundaries of the Isabella Reserva-
tion according to the treaties of 1855 and 1864, consist-
ing of five townships and the north half of two other
townships, all contiguous and situated in Isabella
County. In addition, plaintiff concedes this location is on
"swampland" that the United States patented[2] to the
state of Michigan pursuant to the Swamp Land Act of
September 28, 1850, 43 USC 982. Plaintiff was sen-
tenced on April 11, 2002, to 110 months' to 15 years'
imprisonment.

On February 7, 2005, while serving his prison sen-
tence at the Saginaw Correctional Facility, plaintiff filed
an action for a writ of habeas corpus against the
Saginaw Correctional Facility's warden in the Saginaw
Circuit Court. Plaintiff argued that he should be re-
leased from prison because the state of Michigan lacked
jurisdiction to prosecute him because (1) he was an
enrolled member of the Saginaw Chippewa Indian
Tribe at the time of the offense and (2) the offense
occurred on the Isabella Indian Reservation. He also
argued that various federal constitutional rights were
violated when he was arrested pursuant to a warrant
that lacked probable cause on the matter of jurisdiction
and prosecuted in a forum that had no jurisdiction. The

---

[1] Plaintiff more fully describes this location as being T15N, R5W,
section 7, Nottawa Township, Isabella County.

[2] A "land patent" is "[a] muniment of title issued by a government or
state for the conveyance of some portion of the public domain." Black's
Law Dictionary (4th ed), p 1282.

Attorney General's office argued that the petition should be dismissed because, in substance, plaintiff was seeking judicial review of his conviction and sentence, which took place in the Isabella Circuit Court, and neither the warden nor the Department of Corrections (DOC) is a proper party to an appeal of a criminal conviction.

On April 15, 2005, the Saginaw Circuit Court dismissed plaintiff's petition for lack of jurisdiction. Plaintiff thereafter filed an appeal by right with this Court in Docket No. 262589, which was dismissed for lack of jurisdiction on June 15, 2005, because the April 15, 2005, order was not subject to appeal by right. On May 27, 2005, plaintiff filed an original complaint for habeas relief with this Court. On October 17, 2005, this Court entered an order granting the complaint for a writ of habeas corpus and ordering the parties to "proceed to a full hearing on the merits in the same manner as an appeal of right." On February 22, 2006, this Court entered an order granting the Isabella County Prosecutor's motion to join this action as a party defendant.

## II. STANDARD OF REVIEW

A prisoner's right to file a complaint for habeas corpus relief is guaranteed by Const 1963, art 1, § 12. *Morales v Parole Bd*, 260 Mich App 29, 40; 676 NW2d 221 (2003). Also, this Court has jurisdiction to entertain an action for habeas corpus to inquire into the cause of detention where, as here, the judge in the county where the prisoner was detained refuses to issue the writ. MCL 600.4304(2); MCR 3.303(A)(2); MCR 7.203(C)(3). To the extent that they do not conflict with MCR 7.206, the rules in MCR 3.303 apply to the action. MCR 7.206(B). Where this Court orders a full hearing on the merits, it may do so "with or without referral to a

judicial circuit or tribunal or agency for the taking of proofs and report of factual findings." MCR 7.206(D)(3). The use of a fact-finder is appropriate when there are disputed facts. *Durant v State Bd of Ed,* 424 Mich 364, 394; 381 NW2d 662 (1985).

We review de novo questions of law, including the interpretation of a statute or treaty. *Jones v Dep't of Corrections,* 468 Mich 646, 651; 664 NW2d 717 (2003); *People v Mackle,* 241 Mich App 583, 590; 617 NW2d 339 (2000).

### III. ANALYSIS

As a threshold matter, we reject the DOC's argument that it is not a proper party to this proceeding. Under MCR 3.303(J), the "writ or order may designate the person to whom it is directed as the person having custody of the prisoner." Further, the DOC has "consistently been named as a party in habeas corpus proceedings brought by state prisoners and its role in such proceedings has never been challenged by the appellate courts of this state." *Cross v Dep't of Corrections,* 103 Mich App 409, 413-414; 303 NW2d 218 (1981). The DOC's reliance on MCL 600.4310 is misplaced because that statute does not identify the proper defendant, but rather identifies persons who may not bring an action for a writ of habeas corpus.

The object of the writ of habeas corpus is "to determine the legality of the restraint under which a person is held." *Phillips v Warden, State Prison of Southern Michigan,* 153 Mich App 557, 565; 396 NW2d 482 (1986). The writ of habeas corpus deals with radical defects that render a judgment or proceeding absolutely void. *Hinton v Parole Bd,* 148 Mich App 235, 244-245; 383 NW2d 626 (1986). In general, MCL 600.4310(3) prohibits habeas corpus relief to "[p]ersons convicted,

or in execution, upon legal process, civil or criminal." But relief "is open to a convicted person in one narrow instance, . . . where the convicting court was without jurisdiction to try the defendant for the crime in question." *People v Price*, 23 Mich App 663, 669-670; 179 NW2d 177 (1970). Moreover, to qualify for habeas corpus relief, the jurisdictional defect must be radical, rendering the conviction absolutely void. *Id.* at 670. "A radical defect in jurisdiction contemplates . . . an act or omission by state authorities that clearly contravenes an express legal requirement in existence at the time of the act or omission." *Id.* at 671. Nevertheless, habeas relief may be denied in the exercise of a court's discretion where full relief may be obtained in other more appropriate proceedings. See *Phillips, supra* at 566; see also *Jones, supra* at 658 (order of mandamus, rather than writ of habeas corpus, was the proper remedy for the DOC's failure to conduct a timely fact-finding hearing on parole violation charges). Thus, while plaintiff may not use a habeas proceeding as a substitute for an appeal or to review the merits of his criminal conviction, plaintiff may assert a radical defect in the jurisdiction of the court in which his conviction was obtained. MCL 600.4310(3); *Price, supra* at 669-670.

Here, habeas relief requiring the DOC to release plaintiff might be appropriate because plaintiff raises a jurisdictional challenge to the authority of the state to prosecute him in any state court. Plaintiff did not waive his right to raise a jurisdictional challenge to his conviction by his no-contest plea in the Isabella Circuit Court because the claim implicates the very authority of the state to bring him to trial. See *People v New*, 427 Mich 482, 491; 398 NW2d 358 (1986). Further, this Court's granting the prosecutor's motion to join this case as a defendant has resolved the DOC's concern that the Isabella County Prosecutor is the proper party.

Plaintiff argues that the swampland where the crime occurred is "Indian country," as defined in 18 USC 1151. That statute defines "Indian country" in relevant part as "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation." 18 USC 1151(a). Plaintiff relies on the phrase "notwithstanding the issuance of any patent" to argue that any "swampland" patents of reservation land as established by the treaties of 1855 and 1864 are irrelevant to the determination of "the limits" of the Isabella Indian Reservation. Plaintiff further argues that excluding swampland from the reservation is contrary to the canons of construing Indian treaties, would result in an unworkable jurisdictional checkerboard, and is contrary to federal caselaw. We disagree.

Plaintiff relies on two treaties between the United States and the Chippewa Indians of Saginaw, Swan Creek, and Black River (the Chippewa). The first treaty is dated August 2, 1855. It provides in Article I:

> The United States will withdraw from sale, for the benefit of said Indians, as herein provided, all the unsold public lands within the State of Michigan embraced in the following descriptions, to wit:—
>
> *First.* Six adjoining townships of land in the county of Isabella, to be selected by said Indians within three months from this date, and notice thereof given to their agent.
>
> *Second.* A tract of land in one body, equal in extent to two townships, on the north side of Saginaw Bay, to be selected by them, and notice given as above provided.
>
> The United States will give to each of the said Indians, being the head of a family, eighty acres of land; and to each single person over twenty-one years of age, forty acres of land; and to each family of orphan children . . . eighty acres of land; and to each single orphan child under twenty-one

years of age, forty acres of land; to be selected and located within the several tracts of land hereinbefore described . . . .

The 1855 treaty was amended on April 15, 1856, to change the second description set forth above. In a subsequent treaty, dated October 18, 1864 (and proclaimed on August 16, 1866), the Chippewa released their right to reserved land on the Saginaw Bay and also relinquished to the United States all claims to any right to "locate lands in lieu of lands sold or disposed of by the United States upon their reservation at Isabella, and also the right to purchase the unselected lands in said reservation," as provided for in the 1855 treaty. Specifically, the 1864 treaty refers to the treaty of August 2, 1855, and provides in relevant part:

Article I. The said Chippewas of Saginaw, Swan Creek, and Black River, for and in consideration of the conditions hereinafter specified, do hereby release to the United States the several townships of land reserved to said tribe by said treaty aforesaid, situate and being upon the Saginaw Bay, in said State.

The said Indians also agree to relinquish to the United States all claim to any right they may possess to locate lands in lieu of lands sold or disposed of by the United States upon their reservation at Isabella, and also the right to purchase the unselected lands in said reservation, as provided for in the first article of said treaty.

Article II. In consideration of the foregoing relinquishments, the United States hereby agree to set apart for the exclusive use, ownership, and occupancy of the said [sic] *of the said* Chippewas of Saginaw, Swan Creek, and Black River, all of the unsold lands within the six townships in Isabella County, reserved to said Indians by the treaty of August 2d, 1855, aforesaid, and designated as follows, viz:—

The north half of township fourteen, and townships fifteen and sixteen north, of range three west; the north

half of township fourteen and township fifteen north, of range four west, and townships fourteen and fifteen north, of range five west. [Emphasis in original.][3]

As already noted, plaintiff alleges that the offense occurred in Township 15 North, of Range 5 West (T15N, R5W), section 7 of Nottawa Township, Isabella County. Plaintiff concedes this property is part of the swampland that was patented to the state of Michigan pursuant to an 1850 act of Congress that is commonly known as the Swamp Land Act. See *Sherman v A P Cook Co Ltd*, 98 Mich 61, 62-63; 57 NW 23 (1893), for a description of the act. The act is codified at 43 USC 982, which provides:

To enable the several States (but not including the States of Kansas, Nebraska, and Nevada) to construct the necessary levees and drains, to reclaim the swamp and overflowed lands therein—the whole of the swamp and overflowed lands, made unfit thereby for cultivation, and remaining unsold on or after the 28th day of September, A. D. 1850, are granted and belong to the several States respectively, in which said lands are situated: Provided, however, That said grant of swamp and overflowed lands, as to the State [sic: States] of California, Minnesota, and Oregon, is subject to the limitations, restrictions and conditions hereinafter named and specified in this chapter, as applicable to said three last-named States respectively.

The Isabella County Prosecutor has provided a copy of the original handwritten patent, dated October 12, 1862, by which the United States conveyed "swamp lands," including land in Township 15 North, Range 5 West, to the state of Michigan. The patent recites that it was issued pursuant to the authority of the act of Congress of September 28, 1850. Our Supreme Court

---

[3] The townships referred to are the modern day townships of Wise, Nottawa, Isabella, Denver, and Deerfield, the north half of Union Township, and the north half of Chippewa Township in Isabella County.

has recognized that the Swamp Land Act was a "grant *in praesenti,* and the surveying of the land and the issuance of the patent conclusively fixed the character of the lands." *Collins v Gerhardt,* 237 Mich 38, 64; 211 NW 115 (1926). In *Crapo v Troy,* 98 Mich 635, 638; 57 NW 806 (1894), the Court observed that the act of September 28, 1850, "amounted to a grant *in praesenti,* and that, when a patent was subsequently issued by the Department of the Interior for the lands listed, the act of the Department of the Interior, by relation, took effect as of the date of the grant." In an earlier decision, *Sherman, supra* at 63-65, our Supreme Court apparently first applied the doctrine that a swampland patent issued to the state related back to the date of the act. The Court in both *Crapo* and *Sherman* relied on *French v Fyan,* 93 US 169; 23 L Ed 812 (1876), wherein the Supreme Court opined:

> "This court has decided more than once that the swampland act was a grant *in praesenti,* by which the title to those lands passed at once to the state in which they lay. * * * * The patent, therefore, which is the evidence that the lands contained in it had been identified as swamp lands under that act, relates back and gives certainty to the title of the date of the grant." [*Sherman, supra* at 65, quoting *French v Fyan, supra* at 170.]

Applying this principle to the facts of this case, title to the swampland at issue vested in the state of Michigan before either the treaty of 1855 or the treaty of 1864. Nevertheless, the issue remains whether the treaties of 1855 and 1864 conveyed reservation status, within the meaning of "Indian country" as defined in 18 USC 1151, on the swampland patented to the state under the act of September 28, 1850.

This Court considered a similar question in *Bennett, supra.* Specifically, this Court addressed the effect of 18

USC 1151 on the circuit court's jurisdiction regarding land patented to non-Indians in July 1857 pursuant to cash purchases made in 1854. *Bennett, supra* at 456-458. The defendant in *Bennett*, a member of the Saginaw Chippewa Indian Tribe, sought to quash, on jurisdictional grounds, an information that charged him with operating under the influence of intoxicating liquor, third offense; impaired driving, third offense; and driving with a suspended license, second offense. *Id.* at 456. He successfully argued that the circuit court lacked subject-matter jurisdiction because the road on which he was arrested "is a right-of-way running through the Isabella Indian Reservation, and is therefore, by definition, 'Indian Country.' " *Id.* at 456 (quotation omitted). The prosecutor appealed to this Court the circuit court's order quashing the information. *Id.* The sole issue on appeal was whether the defendant was in "Indian country," as defined in 18 USC 1151. The prosecutor argued that property within the townships described in the treaty of 1864, which had been sold before the treaty's execution, never became part of the Isabella reservation. Accordingly, the prosecutor argued that it could not be considered "Indian country." *Bennett, supra* at 457.

This Court, looking to the terms of the 1864 treaty, held:

> Indian treaties must be construed "so far as possible, in the sense in which the Indians understood them, and in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people." *Choctaw Nation of Indians v United States*, 318 US 423, 432; 63 S Ct 672; 87 L Ed 877 (1943). "The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be

considered as used only in the latter sense." *Worcester v Georgia*, 31 US (6 Pet) 515, 582; 8 L Ed 483 (1832). Ambiguities are to be construed in favor of the Indians. *Oneida Co v Oneida Indian Nation*, 470 US 226, 247; 105 S Ct 1245; 84 L Ed 2d 169 (1985). Courts may not, however, "ignore plain language that, viewed in historical context and given a 'fair appraisal,' . . . clearly runs counter to a tribe's later claims." *Oregon Dep't of Fish & Wildlife v Klamath Indian Tribe*, 473 US 753, 774; 105 S Ct 3420; 87 L Ed 2d 542 (1985).

In this case, the parties have not presented evidence of the negotiations surrounding the formation of the Treaty of October 18, 1864. However, examining the treaty itself, it appears that the parties intended for the previously sold lands to be excluded from the reservation, because the Chippewas were granted all the "unsold" lands within the six townships. Given the plain language of the treaty, and the lack of evidence to the contrary, we believe the Chippewas would have understood at the time of treaty formation that they were not permitted to settle on or own any lands previously patented to individuals. *Choctaw Nation of Indians v United States, supra.*

Therefore, defendant was not on a right of way passing through Indian country when he was arrested, and he was subject to criminal prosecution in state court. [*Bennett, supra* at 458-459.]

Although the instant case contains some factual similarities to *Bennett*, the grant of land to the state pursuant to the Swamp Land Act cannot be characterized as previously sold land. But according to the second paragraph of article I of the treaty of 1864, the Chippewa "agree[d] to relinquish to the United States all claim to any right . . . to locate lands in lieu of *lands sold or disposed of by the United States* upon their reservation at Isabella . . . ." (Emphasis added.) Because land grants to states pursuant to the Swamp Land Act of 1850 could be encompassed within the term "lands . . . disposed of by the United States," we

conclude that the rationale of *Bennett* could be extended to the swampland grants. This is because patents to the state of Michigan for swampland relate back to the date of September 28, 1850, preceding both the treaty of 1855 and, more importantly, the treaty of 1864.

The Isabella County Prosecutor has offered factual support for this interpretation of the treaty of 1864 through the decisions of the Indian Claims Commission. Congress enacted the Indian Claims Commission Act, 25 USC 70 *et seq.*, in 1946 to establish a tribunal to decide Indian tribes' claims against the United States. *Arizona v California*, 530 US 392, 402; 120 S Ct 2304; 147 L Ed 2d 374 (2000). The Indian Claims Commission created under the act ceased operations in 1978. *Arizona, supra* at 403 n 1. While in operation, the commission had exclusive jurisdiction to resolve Indian claims solely by the payment of compensation. It also had jurisdiction to consider claims alleging that treaties were vitiated by fraud, duress, or unconscionable considerations. *Id.*; but see 28 USC 1505 ("The United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe . . . ."). The Indian Claims Commission Act had two purposes. One purpose "was to transfer from Congress to the Indian Claims Commission the responsibility for determining the merits of native American claims." *United States v Dann,* 470 US 39, 45; 105 S Ct 1058; 84 L Ed 2d 28 (1985). But "[t]he 'chief purpose of the [Act was] to dispose of the Indian claims problem with finality.' " *Id.* (citation omitted). Although subject to review by the Court of Claims, *Arizona, supra* at 403 n 1, the commission's reports containing its determinations had the same effect as a final judgment of the Court of Claims when filed with Congress. *Dann, supra* at 45.

The Isabella County Prosecutor relies on 1953 and 1954 Indian Claims Commission decisions in *Saginaw Chippewa Indian Tribe v United States,* Docket No. 13-H, that apparently were not appealed to the Court of Claims. In its 1953 findings of fact, 2 Indian Cl Comm 380, 386 (1953), the commission found no evidence that the swampland granted to the state under the Swamp Land Act was made available for the selection of tribal members under the 1864 treaty. It found that

> the United States granted to the State of Michigan swamp lands within that State, and pursuant to that Act, the State of Michigan, acting through its proper authorities, selected 14,601.41 acres of swamp land within the Isabella Reservation, and 14,829.41 acres of such lands within the Saginaw Reservation. All of such selections were made prior to the treaty of August 2, 1855, and approved by proper authorities of the United States, although patents for all of such selections were not delivered to the State of Michigan until after August 2, 1855. That by the "so-called" Swamp Land Act of 1850 and the action of the State authorities pursuant thereto, all of the swamp land selected in the two reservations passed to the State of Michigan. Furthermore, none of the lands so selected were wrongfully classified as such.
>
> That by reason of said Act of 1850 and the selections made thereunder, the rights thereto for selection or entry did not pass to the Saginaw or its members under the provision of the treaty of August 2, 1855, and such lands were not included in the category of "unsold public lands" within the areas of either the Isabella or Saginaw reservations referred to in Article 1 of the treaty of 1855. [*Id.* at 388-389.]

In its 1953 opinion, the commission specifically addressed the Saginaw Chippewa Tribe's claim that although the swamplands passed to the state as of September 28, 1850, swamplands within the townships described in the treaty of 1855 nevertheless must be

included within the category of "unsold public lands." *Saginaw Chippewa Indian Tribe v United States,* 2 Ind Cl Comm 390, 401. The commission opined:

> The undisputed evidence . . . shows the Indians were well aware of the fact that swamp lands did not pass to the Indians under the 1855 treaty, and at no time claimed they did until the present claim was filed. . . . [D]ocuments plainly indicate that [the Indians] recognized the fact that the swamp lands were not intended to be available for Indian use under the treaty.
>
> Furthermore, the evidence offered of the surrounding circumstances which brought about the treaty of 1855 plainly shows that the parties to that treaty understood that in using the phrase "unsold public lands" within the area of the Isabella and Saginaw Reservations that it did not include the swamp lands previously selected therein, in fact, the request for additional lands in the Saginaw Bay area was based upon the understanding of all parties to the 1855 treaty that the Indians were not to receive the swamp lands. [*Id.* at 401-402.]

These findings, if accepted, support the Isabella County Prosecutor's claim that the swampland was not intended to be part of the Isabella reservation because it was owned by the state of Michigan before any treaty between the United States and the Chippewa of Saginaw, Swan Creek, and Black River.

Plaintiff, on the other hand, argues that *Bennett* was wrongly decided. In particular, plaintiff asserts that the *Bennett* decision contravened settled principles of interpreting Indian treaties, and that it is contrary to several federal decisions rejecting the "checkerboard" jurisdiction the Isabella County Prosecutor espouses, which *Bennett* adopted. Plaintiff contends that "Indian country," with respect to the Isabella reservation, is established by the exterior boundaries of the townships reserved to the Chippewa in the 1864 treaty, i.e., "all

land within the limits of any Indian reservation . . . notwithstanding the issuance of any patent," 18 USC 1151, or land grant authorized by the Swamp Land Act of 1850. To complete his jurisdictional argument, plaintiff asserts that because he is an enrolled member of the Saginaw Chippewa Indian Tribe and the offense occurred in "Indian country," jurisdiction to try the offense is exclusively federal or tribal.

Accepting that plaintiff is an "Indian," if the offense did occur in "Indian country," there is merit to plaintiff's jurisdictional claim. Plaintiff relies on both 18 USC 1152 and 1153. The former statute, 18 USC 1152, has been referred to as the General Crimes Act or the Indian Country Crimes Act, while the latter statute, 18 USC 1153, is known as the Indian Major Crimes Act or the Major Crimes Act. See *United States v Peltier*, 344 F Supp 2d 539, 543-544 (ED Mich, 2004); *United States v Male Juvenile*, 280 F3d 1008, 1012 (CA 9, 2002).

The General Crimes Act, 18 USC 1152, provides:

> Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.
>
> This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

The Major Crimes Act, 18 USC 1153, provides in relevant part:

> (a) Any Indian who commits against the person or property of another Indian or other person any of the

following offenses, namely, . . . a felony under chapter 109A, . . . within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

(b) Any offense referred to in subsection (a) of this section that is not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense.

Chapter 109A (sexual abuse), 18 USC 2241 *et seq.*, provides in part:

Whoever, in the special maritime and territorial jurisdiction of the United States . . . knowingly causes another person to engage in a sexual act—

(1) by using force against that other person; or

(2) by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnaping;

or attempts to do so, shall be fined under this title, imprisoned for any term of years or life, or both. [18 USC 2241(a).]

The Supreme Court discussed the interplay between 18 USC 1152 and 1153 in *Negonsott v Samuels*, 507 US 99; 113 S Ct 1119; 122 L Ed 2d 457 (1993). After finding criminal jurisdiction over offenses committed in "Indian country" to be a complex patchwork of federal, state, and tribal law, the Court indicated that federal jurisdiction over offenses covered by the Indian Major Crimes Act is "exclusive" of state jurisdiction. *Negonsott, supra* at 102-103. Because the CSC offense underlying defendant's conviction involved force or coercion, MCL 750.520d(1)(b), it would be "a felony under Chapter 109A." 18 USC 1153. Thus, assuming that plaintiff is an "Indian" and the offense occurred in "Indian

country," plaintiff's jurisdictional argument has merit. See, e.g., *United States v Jones*, 440 F3d 927, 929 (CA 8, 2006) (the United States has exclusive jurisdiction where an Indian committed the enumerated felony of aggravated sexual abuse against another Indian or person in Indian country); *United States v Johnson*, 637 F2d 1224, 1231 n 11 (CA 9, 1980) (Indian-against-Indian crimes and Indian-against-non-Indian crimes enumerated in 18 USC 1153 are subject to federal jurisdiction).

We note that the issue plaintiff raises involves the interpretation of federal law. Michigan courts are permitted to construe federal law, subject to the rule that state courts are bound by decisions of the United States Supreme Court that pertain. See *Abela v Gen Motors Corp*, 469 Mich 603, 606; 677 NW2d 325 (2004). As further explained in *Cowles v Bank West*, 476 Mich 1, 33-34; 719 NW2d 94 (2006), when adopting the rationale of and quoting *Cowles v Bank West*, 263 Mich App 213, 233; 687 NW2d 603 (2004), with respect to a matter of federal law:

> "When construing federal statutes and regulations, we are governed by authoritative decisions of the federal courts. *Bement v Grand Rapids & I R Co*, 194 Mich 64, 65-66; 160 NW 424 (1916). Where no decision on a particular issue has been rendered by the United States Supreme Court, we are free to adopt decisions of the lower federal courts if we find their analysis and conclusions persuasive and appropriate for our jurisprudence. *Abela v Gen Motors Corp*, 469 Mich 603, 606-607; 677 NW2d 325 (2004)."

Plaintiff primarily relies on four federal decisions to support his argument that *Bennett* was wrongly decided. We first address *Seymour v Superintendent of Washington State Penitentiary*, 368 US 351; 82 S Ct 424; 7 L Ed 2d 346 (1962), which, if applicable, would be binding on this Court regarding matters of federal law.

Indeed, plaintiff argues that *Seymour* compels the conclusion that only the exterior boundaries of an Indian reservation are material to the determination of what land comprises "Indian country" under 18 USC 1151. In *Seymour*, however, the reservation in question was created in 1872, by executive order of President Grant, and diminished in 1892 by an act of Congress. *Seymour, supra* at 354. One of the questions before the Supreme Court was whether a parcel in the remaining portion of the reservation was no longer "Indian country" because a non-Indian held a patent in fee. Relying on the language in 18 USC 1151, "notwithstanding the issuance of any patent," the Supreme Court rejected this argument. *Id.* at 357-358. The Supreme Court held that the ownership of the particular parcel was immaterial to whether the land was part of the reservation, absent congressional action to remove it from the previously created reservation. *Id.* at 358-359. Because the instant case involves whether swampland patented to the state was ever part of the reservation, not whether the swampland was removed from the reservation after the creation of the reservation, *Seymour* does not apply.

The other three cases on which plaintiff relies also provide no persuasive basis for disagreeing with *Bennett*. Plaintiff's reliance on *Peltier, supra*, is misplaced because it was undisputed in that case that the defendant's arrest and warrant occurred in "Indian country" as defined in 18 USC 1151. *Peltier, supra* at 543. The court held that although the offenses with which the defendant was charged were not listed offenses under the Major Crimes Act, 18 USC 1153, the federal court had jurisdiction under the General Crimes Act, 18 USC 1152. *Peltier, supra* at 543-544. The other two cases, *Cardinal v United States,* 954 F2d 359 (CA 6, 1992), and *Keweenaw Bay Indian Community v Michigan,* 784 F

Supp 418 (WD Mich, 1991), both involve the Keweenaw Bay Indian Reservation in Michigan.

First, in *Keweenaw Bay Indian Community, supra,* the United States District Court for the Western District of Michigan, following a bench trial, made findings of fact with respect to an action for declaratory relief regarding the boundary of the Keweenaw Bay Indian Reservation in Michigan under the terms of an 1854 treaty. As in the 1855 treaty in this case, the United States agreed to set apart and withhold from sale, for the use of certain bands of Chippewa Indians, all "unsold lands" in specified Michigan townships or fractions of townships. *Keweenaw Bay Indian Community, supra* at 419. Unlike the instant case, however, there was no amendment to the treaty or earlier findings by the Indian Claims Commission. Using the trial evidence before it, the district court construed what it perceived to be ambiguity in the "unsold lands" language in the 1854 treaty by holding that title to the property within the specified townships or fractions of townships was immaterial. Viewed from the Indians' perspective, the district court found it clear that the Indians understood that their reservation was intended to follow the exterior lines of the townships and fractional lines of the townships described therein, irrespective of the land title in that area. *Id.* at 425. Rather, it was determined that "[t]he significance of this language, as it was understood by the Indians, was merely that some parcels within the reservation had already been disposed of by the United States and would, therefore, not be available for allotment to the Indians." *Id.* at 426. The court further held that a contrary construction of the treaty would result in a "checkerboard" reservation, "a result clearly *not* intended by anyone signing the treaty." *Id.*

Significantly, the district court found evidence that the Indians were on notice of only "one unaffiliated white landholder within the townships which formed their reservation." *Id.* at 425. Further, the district court found that the record was "devoid of any evidence demonstrating that, at the time of the treaty, either the Indians or the treaty commissioners had any knowledge whatsoever of canal, school and swamplands." *Id.* at 426. This differs from the instant case in which the Indian Claims Commission found that the parties understood that swampland was not intended to be available to the Indians under the treaty. *Saginaw Chippewa Indian Tribe,* 2 Ind Cl Comm at 402. It also differs from the circumstances in *Bennett, supra* at 458, in which this Court was asked to construe the 1864 treaty without any evidence of the negotiations surrounding the formation of the treaty.

Because the facts regarding the treaty at issue in this case, as determined by the Indian Claims Commission, are distinct from *Keweenaw Bay Indian Community*, we conclude that that case does not provide a persuasive reason to reject the rule of law established in *Bennett.* Although following *Bennett* might cause the "checkerboard" of jurisdiction disapproved of in *Keweenaw Bay Indian Community* and *Seymour,* we find it unreasonable to treat land that was never intended to be part of the Isabella Indian Reservation as reservation land solely to achieve a well-defined boundary. Although the issuance of a patent is not material under 18 USC 1151, the statute clearly requires that the land be within the limits of an Indian reservation to come within the jurisdiction of the United States.

In *Cardinal, supra,* the Sixth Circuit Court of Appeals considered the 1854 treaty for the Keweenaw Bay Indian Reservation without mentioning the district

court's decision in *Keweenaw Bay Indian Community*. The question before the Sixth Circuit was whether a parcel of property within the specified area was "unsold land" at the time of the 1854 treaty and, thereby, was actually set aside as reservation land for the Indian tribe or was sold as canal land before the effective date of the treaty. *Cardinal, supra* at 361. The Sixth Circuit held that the property constituted "unsold land" at the relevant time. *Id.* at 363-364. In the absence of proof that the Indians surrendered their right of occupancy or Congress expressly extinguished that right, the Sixth Circuit concluded that the parcel was within the property set aside for the reservation. *Id.* at 365. This differs from the instant case, which involves no land that can be characterized as "unsold land." The findings of the Indian Claims Commission determined its character.

The Isabella County Prosecutor argues that this Court should be bound by the commission's decision on the basis of two underlying legal principles. First, the prosecutor points out that the Ninth Circuit Court of Appeals has held that final decisions of the commission are binding on the United States and tribes in later lawsuits against state and local governments. The essence of the Ninth Circuit decision is that title rights may not be relitigated if a monetary award by the commission in favor of the Indian tribe operates to extinguish title. See *Western Shoshone Nat'l Council v Molini*, 951 F2d 200, 202-203 (CA 9, 2000) (commission's award of $26 million to Indian tribe for the extinguishment of title constituted a general determination of title and barred the Indian tribe from asserting title against the state of Nevada). Because the present case does not involve a monetary award for title, we find that the prosecutor's reliance on this Ninth Circuit precedent is misplaced.

Second, the prosecutor correctly points out that in *Oglala Sioux Tribe v Homestake Mining Co,* 722 F2d 1407, 1413-1414 (CA 8, 1983), the Eighth Circuit Court of Appeals found that a commission decision, under the doctrine of collateral estoppel, precluded a tribe from litigating title in an action against a private party. Notwithstanding the prosecutor's cursory treatment of this issue, we conclude that there is merit in the prosecutor's position that the doctrine of collateral estoppel applies. Collateral estoppel is a rule of issue preclusion. It bars the "relitigation of an issue in a new action arising between the same parties or their privies when the earlier proceeding resulted in a valid final judgment and the issue in question was actually and necessarily determined in that prior proceeding." *Leahy v Orion Twp,* 269 Mich App 527, 530; 711 NW2d 438 (2006). But the absence of mutuality does not always preclude application of collateral estoppel. *Monat v State Farm Ins Co,* 469 Mich 679, 688; 677 NW2d 843 (2004). In *Monat, supra* at 695, our Supreme Court held that, where collateral estoppel is asserted against a party who already had a full and fair opportunity to litigate the issue, mutuality is not required. Although plaintiff was not a party to the matter before the Indian Claims Commission, he claims rights as a member of the Indian tribe that was a party. "To be in privity is to be so identified in interest with another party that the first litigant represents the same legal right that the later litigant is trying to assert." *Adair v Michigan,* 470 Mich 105, 122; 680 NW2d 386 (2004). Because plaintiff is claiming rights as a member of the Saginaw Chippewa Indian Tribe, we find that the requisite privity exists to apply the doctrine of collateral estoppel in this case.

The fact that the instant case is a criminal case should not preclude application of the doctrine. Collat-

eral estoppel cannot be invoked to preclude a defendant from contesting an essential element of a criminal charge. *People v Goss (After Remand)*, 446 Mich 587, 600 (LEVIN, J.), 610-611 (BRICKLEY, J.); 521 NW2d 312 (1994). But because the instant issue involves only a jurisdictional challenge to the Isabella County Prosecutor's authority to prosecute plaintiff in the criminal case, we conclude that it is permissible under *Monat, supra* at 695, for the prosecutor to make defensive use of collateral estoppel to preclude relitigation of an issue previously litigated by plaintiff's Indian tribe regarding whether the swampland was part of the reservation. The doctrine, as applied, promotes the efficient administration of justice and ensures more consistent judicial decisions. *Id*. It also furthers the purpose of the Indian Claims Commission Act by according finality to the Indian Claims Commission's determinations regarding Indian claims. *Dann, supra* at 45. Applying the rule of law established in *Bennett* to the commission's finding, it follows that the swampland granted to the state of Michigan is not "Indian country" as a matter of law because it is not "within the limits of any Indian reservation under the jurisdiction of the United States Government," as required by 18 USC 1151.

We find the foregoing determination to be dispositive of the remainder of plaintiff's claims. Specifically, because the offense did not occur in "Indian country," plaintiff's claims regarding the Indian Commerce Clause, US Const, art I, § 8, cl 3; the Treaty Clause, US Const, art II, § 2, cl 2; and the Supremacy Clause, US Const, art VI, cl 2, are without merit. The only issue material to this state habeas proceeding is whether the state, acting through the Isabella County Prosecutor, had jurisdiction to prosecute plaintiff for the CSC offense. Plaintiff has failed to establish a jurisdictional defect necessary for habeas relief.

Plaintiff also requests that this Court consider various constitutional claims within the framework of 42 USC 1983, but he has failed to brief the relevancy of 42 USC 1983 to this state habeas corpus proceeding. "A party may not merely state a position and then leave it to this Court to discover and rationalize the basis for the claim." *Mackle, supra* at 604 n 4.

In any event, a complaint under 42 USC 1983 is a separate avenue for relief from a complaint for habeas corpus. See *Hill v McDonough*, ___ US ___ ; 126 S Ct 2096, 2101; 165 L Ed 2d 44 (2006) (distinguishing actions under 42 USC 1983 to challenge the circumstances of confinement and federal habeas corpus proceedings to challenge the lawfulness or duration of confinement). Under 42 USC 1983, civil remedies may be granted for a violation of constitutional rights. See *People v Stevens (After Remand)*, 460 Mich 626, 641; 597 NW2d 53 (1999). "The statute creates no substantive rights, but instead merely supplies a remedy for deprivation of rights created by other laws." *Davis v Wayne Co Sheriff*, 201 Mich App 572, 576; 507 NW2d 751 (1993). Because the present case does not involve a complaint for civil remedies under 42 USC 1983, plaintiff's claims under 42 USC 1983 are without merit.

For all of the foregoing reasons, plaintiff has not established a defect in the jurisdiction of the Isabella Circuit Court, and we dismiss his complaint for habeas corpus.