*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

NONHUMAN RIGHTS PROJECT, INC,

        Plaintiff-Appellant,

v

DEYOUNG FAMILY ZOO, LLC and HAROLD L. DEYOUNG,

        Defendants-Appellees.

FOR PUBLICATION
October 17, 2025
2:24 PM

No. 369247
Menominee Circuit Court
LC No. 23-017621-AH

Before: SWARTZLE, P.J., and ACKERMAN and TREBILCOCK, JJ.

ACKERMAN, J.

This appeal presents a novel request for a centuries-old remedy: a petition for habeas corpus on behalf of seven chimpanzees. The trial court summarily denied the petition on the ground that chimpanzees are not "persons" eligible for the writ, and plaintiff appeals of right.

Oft-sought but rarely granted, the Great Writ's reputation so far precedes it that the practical details of obtaining it are shrouded in mystery to both bench and bar. The lack of clarity extends to this Court's jurisdiction, with a split of authority in prior nonbinding decisions about whether we have jurisdiction on an appeal of right from a habeas decision; we resolve the split in favor of our jurisdiction. On the merits, we hold that chimpanzees are not "persons" eligible for habeas relief and therefore affirm the trial court's decision to deny the petition.

## I. FACTS

Plaintiff Nonhuman Rights Project is a nonprofit advocacy organization that describes itself as "dedicated solely to securing legal rights for nonhuman animals." It filed a 109-page complaint in circuit court seeking a writ of habeas corpus on behalf of seven chimpanzees kept at defendant DeYoung Family Zoo, a private "roadside" zoo in Wallace that is owned by codefendant Harold DeYoung. The complaint alleges that the chimpanzees are denied conditions proper to their species, including sufficient social interaction and year-round outdoor space. It also discusses at length the chimpanzees' "numerous cognitively complex abilities," which plaintiff claims defendants have failed to accommodate. Plaintiff asked the court to order defendants to show

-1-

cause justifying the chimpanzees' ongoing detention and, ultimately, to order their relocation "to a chimpanzee sanctuary accredited by the Global Federation of Animal Sanctuaries."

The circuit court summarily denied relief without holding a hearing, concluding that chimpanzees are not "persons" who are eligible for habeas relief. Plaintiff then filed a claim of appeal in this Court.

## II. STANDARD OF REVIEW

Even though no party challenges this Court's jurisdiction, "[t]he question of jurisdiction is always within the scope of this Court's review." *Walsh v Taylor*, 263 Mich App 618, 622; 689 NW2d 506 (2004). We interpret the statutes and court rules that establish our jurisdiction de novo. *Chen v Wayne State Univ*, 284 Mich App 172, 191; 771 NW2d 820 (2009). The substantive issues in this case involve constitutional, statutory, and common-law questions. "Questions of constitutional law are reviewed by this Court de novo," *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002), as are questions of statutory interpretation, *Chen*, 284 Mich App at 191. "This Court also reviews de novo as a question of law the proper interpretation and application of the common law." *Brecht v Henry*, 297 Mich App 732, 737; 825 NW2d 110 (2012).

## III. JURISDICTION

As a general matter, this Court "has jurisdiction of an appeal of right" from "[a] final judgment or order of the circuit court . . . as defined in MCR 7.202(6)." MCR 7.203(A)(1). In civil cases, a "final judgment" or "final order" is "the first judgment or order that disposes of all the claims and adjudicates the rights and liabilities of all the parties." MCR 7.202(6)(a)(i). Plaintiff seeks to invoke these provisions as the basis for appellate jurisdiction. Some prior authority, however, holds that to seek review of a habeas decision, a party must file an original action in this Court rather than an appeal. We therefore must decide whether we have jurisdiction to entertain this appeal of right.

### A. ORIGINAL ACTIONS FOR HABEAS

In *Triplett v Deputy Warden*, 142 Mich App 774, 779; 371 NW2d 862 (1985), this Court held that "the circuit court's denial of plaintiff's complaint for habeas corpus is not properly before this Court on appeal."

> It has long been established that a writ of error does not lie to review habeas corpus proceedings. *In re Brock*, 144 Mich 42; 107 NW 446 (1906). Orders of denial in habeas corpus proceedings are not appealable as of right. They may be renewed by filing an original complaint in the Court of Appeals. *Parshay v Warden of Marquette Prison*, 30 Mich App 556, 558; 186 NW2d 859 (1971). . . .
>
> In the instant case, plaintiff filed a "claim of appeal" from the circuit court's denial of his complaint for habeas corpus. Since there is no appeal as of right from the circuit court's action, *this Court cannot properly review the validity of the circuit court's denial of plaintiff's complaint*. [*Triplett*, 142 Mich App at 779-780 (emphasis added).]

-2-

Under that ruling, we would lack jurisdiction to entertain plaintiff's appeal.  As a published opinion, *Triplett* "has precedential effect under the rule of stare decisis," but we are not bound to follow it because it was issued before November 1, 1990.  MCR 7.215(C)(2), (J)(1).  See also *Woodring v Phoenix Ins Co*, 325 Mich App 108, 114-115; 923 NW2d 607 (2018) ("[W]e are not *strictly required* to follow uncontradicted opinions from this Court decided before November 1, 1990, but we think they are nevertheless considered to be precedent and entitled to significantly greater deference than are unpublished cases.").  We must therefore decide whether to follow it.

As *Triplett* recognized, our Supreme Court held in *Brock* that a "writ of error" was not a viable means of reviewing a denial of habeas corpus.  *Brock* relied on *People v Fairman*, 59 Mich 568, 569; 26 NW 769 (1886), which explained that "[t]here is no statute in this state which authorizes a writ of error" to review a habeas decision.  At that time, the applicable statute provided that "[w]rits of error . . . upon any final judgment or determination, may issue of course, out of the supreme court."  2 How Stat 8678.  By ruling that no statute authorized a writ of error to review a habeas decision, the Court necessarily held that a habeas decision was not a "final judgment or determination" under 2 How Stat 8678.  The same statutory language was in effect when *Brock* was decided.  See 1897 CL 10,484.

That did not render habeas decisions unreviewable.  Instead, the Court explained that "certiorari is the writ by which this court reviews such habeas corpus proceedings as are reviewable." *Brock*, 144 Mich at 43.  The distinction between writs of error and writs of certiorari parallels today's division between appeals of right and appeals by leave.  Consistent with that framework, the Supreme Court explained that "[a] writ of error lies to review the final order or determination of the circuit court" and that "[i]t is settled by our decisions that an order which puts an end to a suit is a final judgment reviewable by writ of error." *City of Flint v Genesee Circuit Judge*, 146 Mich 439, 440; 109 NW 769 (1906).  "Appeals at law are a substitute for the constitutional writ of error and, in the absence of express authorization, an appeal at law will lie only from a final judgment." *Mondou v Lincoln Mut Cas Co*, 283 Mich 353, 362; 278 NW 94 (1938).  By contrast, certiorari was the manner in which the Court granted discretionary review. See *Quandt v Schwass*, 286 Mich 433, 436; 282 NW 206 (1938) ("[W]e granted leave to appeal in the nature of a writ of certiorari.").

The Supreme Court adhered to *Brock*'s rule—that habeas decisions must be reviewed by a writ of certiorari or application for leave—for decades.  See, e.g., *People v McCager*, 367 Mich 116, 124-125; 116 NW2d 205 (1962) (noting that, under *Brock*, a writ of habeas corpus must be reviewed "by application").  The General Court Rules of 1963 expressly incorporated *Brock*'s holding.  The original version of those rules provided that "an aggrieved party may have an appeal as a matter of right . . . if the appeal is taken from a final order, judgment or sentence," but "[l]eave to appeal shall be required" in various matters, including "[f]inal orders and judgments in habeas corpus proceedings."  GCR 1963, 806.1 and .2(4) (as adopted).

When the Court of Appeals was created a few years later, it inherited the Supreme Court's appeal-by-right docket.  As enacted by 1964 PA 281, this Court was given jurisdiction over "[a]ll final judgments," MCL 600.308(1) (as enacted), and "[a]ll appeals to the court of appeals from final judgments or decisions permitted by this act shall be a matter of right," MCL 600.309 (as enacted).  We also had jurisdiction over "[s]uch other judgments or interlocutory orders as the

supreme court may by rule determine," § 308(3), and these other appeals were to "be by right or by leave as provided by . . . rules promulgated by the supreme court," § 309.

The General Court Rules were revised to reflect these changes. They continued to provide that "an aggrieved party shall have a right to appeal from all final judgments," but the list of matters in which "[t]he Court of Appeals may grant leave" no longer singled out habeas, instead covering "[a]ny judgment, order, act, or failure to act by the circuit courts . . . which is not a final judgment appealable of right." GCR 1963, 806.1 and .2(3), as amended October 9, 1964, 373 Mich xxxviii (1964).

The deletion of habeas as a specific example of a decision that "is not a final judgment appealable of right" caused subsequent confusion. In *Parshay*, the plaintiff filed what he called a "motion for superintending control" challenging certain conditions of his prison confinement. The trial court treated it as a request for habeas corpus and denied it, and he appealed as of right. On appeal, this Court concluded:

> GCR 1963, 806.2(4) originally required leave to appeal whether an original writ was granted or denied. Under the present rules, final orders granting or denying writs of superintending control, *mandamus*, or *quo warranto* are appealable as of right as is a final judgment in any civil action. GCR 1963, 806.1. Orders of denial in *habeas corpus* proceedings are not appealable as of right. They may be renewed by filing an original complaint in the Court of Appeals. [*Parshay*, 30 Mich App at 558.]

On that basis, we held that "[i]f this case is treated as founded on *habeas corpus*, it is not properly before us." *Id*. *Triplett* then relied on *Parshay*, and several unpublished decisions have repeated the *Triplett* rule.[1]

We believe *Parshay* contained an unpersuasive leap of logic. If *Fairman* established that habeas decisions are not "final judgments," and *Brock* established that habeas decisions are properly reviewed by a writ of certiorari, then the natural conclusion should have been that the appellant was required to file an application for leave to appeal under GCR 1963, 806.2(3)—an appeal of a judgment "which is not a final judgment appealable of right." Instead, *Parshay* concluded that the only remedy was to renew the habeas request in this Court as an original action.

---

[1] *People v Ragland*, unpublished order of the Court of Appeals, entered May 11, 2018 (Docket No. 341347); *Kitchen v Gus Harrison Correctional Facility Warden*, unpublished per curiam opinion of the Court of Appeals, issued October 12, 2017 (Docket No. 335499), p 3 n 2; *Bird v Gus Harrison Correctional Facility Warden*, unpublished per curiam opinion of the Court of Appeals, issued October 10, 2017 (Docket No. 335468), p 3 n 3; *People v Crimes*, unpublished order of the Court of Appeals, issued June 23, 2016 (Docket No. 333011); *Jones v Dep't of Corrections*, memorandum opinion of the Court of Appeals, issued January 22, 2013 (Docket No. 309182), p 1; *Wem v Dep't of Corrections*, unpublished per curiam opinion of the Court of Appeals, issued July 7, 2011 (Docket No. 297618), p 4 n 2.

It is true that the Court of Appeals has jurisdiction to entertain original habeas actions. See MCL 600.4304(2). And when *Parshay* was decided, the rules listed this Court as a potential forum for such actions. See GCR 1963, 712.1(2). But those same rules directed that, "[i]f a circuit court has jurisdiction, the action shall be commenced in the circuit court, and not in the Supreme Court or Court of Appeals." GCR 1963, 710.1(1)(b), (3).[2] Commentary confirmed that it was not expected that the Court of Appeals would exercise original habeas jurisdiction in most cases: "While sub-rule 712.1 affirms the power of the Court of Appeals and their judges to issue writs of habeas corpus, this jurisdiction will be exercised only in exceptional circumstances." 4 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), p 120.

> Since the circuit court of the county in which the prisoner is detained will always have jurisdiction, the Court of Appeals will normally become involved in habeas corpus cases only by way of reviewing the action of the circuit court in such matters, and not by way of original jurisdiction. . . .

> The great bulk of habeas corpus jurisdiction will continue to be exercised by the circuit courts and the judges thereof. [*Id*.]

That framework leaves little room for *Parshay*'s contrary suggestion that a renewed original petition in this Court was the proper avenue of review.

If *Parshay* is unpersuasive, and *Triplett* relied on *Parshay*, then it seems a simple matter to conclude that *Triplett* is itself unpersuasive. It follows that an original action for habeas in this Court is *not* the exclusive means of obtaining review of a trial court's denial of habeas relief. That said, there are further complications that potentially rehabilitate the *Triplett* rule. Under GCR 1963, 712.1(2), the proper venue for a habeas action was "the county in which the prisoner is detained," but if a petitioner could show that "there is no judge in that county capable of issuing the writ, or if the judge has refused to issue the writ," the petitioner could present the complaint "to the circuit court or judge of any adjoining county." When the Michigan Court Rules of 1985 were adopted, this was amended. The current rule provides that in those same circumstances—no judge is available, or "the judicial circuit for that county has refused to issue the writ"—"the action may be brought in the Court of Appeals." MCR 3.303(A)(2).

Subsequent courts have read MCR 3.303(A)(2)'s reference to this Court as an alternative forum to reinforce *Triplett*. In a federal proceeding about whether a habeas petitioner had exhausted state-court remedies under 28 USC 2254(b)(1)(A), a court held:

> Under Michigan law, orders of denial in habeas proceedings are not reviewable by appeal. The appropriate method of review is the filing of an original habeas action in the Court of Appeals . . . .

> At the hearing, the Attorney General was unable to cite any case, statute or court rule to support the availability of appeal. The Attorney General did suggest that the Michigan Court Rules had been amended since the above-cited cases were

---

[2] That remains a requirement under the Michigan Court Rules of 1985. See MCR 3.301(A)(1)(b).

decided. The Attorney General could not, however, point to any relevant difference between the 1963 court rules and the 1985 court rules in this regard. *See* Mich. Court Rule 3.303(A)(2). [*Witzke v Withrow*, 702 F Supp 1338, 1350 (WD Mich, 1988) (citations omitted).]

We likewise have said that "this Court has jurisdiction to entertain an action for habeas corpus to inquire into the cause of detention where . . . the judge in the county where the prisoner was detained refuses to issue the writ." *Moses v Dep't of Corrections*, 274 Mich App 481, 484; 736 NW2d 269 (2007).[3] See also *Kato v Dep't of Corrections*, 504 Mich 961, 961 (2019) (CAVANAGH, J., concurring).

We find that reading of MCR 3.303(A)(2) unpersuasive. The original provision to allow for seeking relief in an adjoining county was "consistent with the historical assumption that the denial of the writ does not bar subsequent applications." Honigman & Hawkins, p 121. But in Michigan, that assumption does not hold: "The judgment in circuit court is res adjudicata of the validity of such imprisonment unless reversed." *In re Harrand*, 254 Mich 584, 587; 236 NW 869 (1931). The 1985 adoption of MCR 3.303(A)(2) should not be read to alter the means of reviewing a habeas decision that has existed since *Brock*: via what was originally called a petition for a writ of certiorari and is now called an application for leave to appeal. As a result, we do not read MCR 3.303(A)(2) as rehabilitating the *Triplett* rule—an original action for habeas is not the exclusive means of bringing a trial court's denial of habeas relief within our jurisdiction.[4]

## B. APPEAL OF RIGHT OR BY LEAVE

If an original action for habeas is not the exclusive avenue for seeking review in this Court, we must still address what sort of appeal *is* proper—an appeal of right or by leave. If MCR 3.303(A)(2) did not rehabilitate the *Triplett* rule, then the law since *Brock* would be unchanged, and plaintiff should have filed an application for leave, not a claim of appeal.

Recent unpublished decisions of this Court, however, have rejected *Triplett*'s requirement of an original habeas action in this Court on a different basis. They reason that *Brock* was a product of the common law governing writs of error, whereas we now operate under a comprehensive statutory and rule-based framework for appellate jurisdiction. On that view, a habeas denial falls

---

[3] Indeed, *Moses* was initiated by an original action for habeas corpus after this Court previously dismissed, sua sponte, the plaintiff's appeal of right from the underlying circuit court denial of his requested writ in reliance on *Triplett*. See *Moses v Dep't of Corrections*, unpublished order of the Court of Appeals, entered June 15, 2005 (Docket No. 262589).

[4] We note that *Harrand* suggests that a trial court's denial of a habeas petition is res judicata. If so, it would be improper to bring an original action for habeas in this Court after a trial court's denial. That said, *Moses* holds to the contrary. If plaintiff had filed an original action for habeas in this Court, we would be bound under MCR 7.215(J)(1) to follow *Moses* and treat the prior denial as non-preclusive, even if we harbor doubts about *Moses*. Because plaintiff did not file an original action in this Court, *Moses* does not control.

within MCR 7.202(6)(a)(i)'s definition of a "final order" and is therefore reviewable by appeal of right.[5] The problem with that approach is that the definition was adopted in the mid-1990s, see 450 Mich clv, clv (1995), at a time when this Court's statutory jurisdiction was still limited to "final judgments." Since at least *Fairman*, the Supreme Court had held that habeas denials are not "final judgments" under the applicable statutory language. The definition of "final judgment" the Supreme Court adopted via court rule should not be read to override the Court's own prior interpretation of what the Legislature meant by that term.

Critically, however, the Legislature has since amended our jurisdiction. Now, our statutory authority is a dichotomy between appeals of right "from all final judgments and final orders . . . *as those terms are defined by law and supreme court rule*," and appeals by leave from "[a]ny other judgment . . . *as determined by supreme court rule*." MCL 600.308(1), (2)(c), as amended by 2016 PA 186 (emphasis added). Previously, jurisdiction turned on the Legislature's understanding of "final judgment" (as interpreted in *Fairman*), and the Supreme Court's rules operated only within that boundary. Now, the statute incorporates the Supreme Court's definition of "final judgment" by reference. The plain terms of MCR 7.202(6)(a)(i) would seem to encompass habeas proceedings; the only reason not to so construe it would be to ensure that it comported with the Supreme Court's decision in *Fairman*. Because the statute now incorporates the Supreme Court's definition, this calculus changes—especially when the Supreme Court's definition of a decision appealable by leave is simply "a judgment . . . that is not a final judgment appealable of right." MCR 7.203(B)(1). In effect, the 2016 legislation overruled *Fairman* by eliminating any independent legislative intent for the meaning of "final judgment" beyond how the Supreme Court has defined it, as supplemented by express statutory designations.

In short, reliance on *Fairman*'s interpretation of "final judgment" is no longer tenable. Because the statute now expressly directs us to the Supreme Court's rules, and because those definitions leave no gap into which habeas denials might fall, we conclude that this Court has jurisdiction over an appeal of right from the denial of habeas relief.[6]

## IV. HABEAS CORPUS

Plaintiff seeks a writ of habeas corpus in admittedly novel circumstances. We begin with the nature of the writ and then address plaintiff's argument that the chimpanzees in defendants' zoo are eligible for habeas relief.

---

[5] See *Ortiz-Kehoe v Chippewa Correctional Facility Warden*, unpublished per curiam opinion of the Court of Appeals, issued December 15, 2022 (Docket No. 361179), p 5; *Jefferson v Mich Reformatory Warden*, unpublished per curiam opinion of the Court of Appeals, issued October 18, 2018 (Docket No. 341955), p 1 n 1.

[6] Although *Moses* noted that an earlier appeal of right from a habeas denial in that case had been dismissed in an unpublished order for lack of jurisdiction, it did not endorse that dismissal. See 274 Mich App at 484. As in *Ortiz-Kehoe* and *Jefferson*, we are therefore free to conclude that this appeal of right is properly before us.

## A.  NATURE OF HABEAS CORPUS

The writ of habeas corpus is "a civil proceeding the main purpose of which is to cause the release of persons illegally confined, to inquire into the authority of law by which a person is deprived of his liberty." *McCager*, 367 Mich at 121.

> The right to a writ of habeas corpus is fundamental to personal liberty.  Its sources in the common law go back to the earliest struggles for freedom, and precede the provision of the Magna Charta that no "freeman shall be taken or imprisoned * * * unless by the lawful judgment of his peers, or by the law of the land."  [*Goetz v Black*, 256 Mich 564, 567; 240 NW 94 (1932).]

Blackstone described habeas as a remedy for false imprisonment:

> We are next to consider the violation of the right of personal liberty.  This is effected by the injury of false imprisonment, for which the law has . . . given a private reparation to the party; as well by removing the actual confinement for the present, as, after it is over, by subjecting the wrongdoer to a civil action, on account of the damage sustained by the loss of time and liberty.  [3 Blackstone, Commentaries on the Laws of England, p *127.]

"The means of *removing* the actual injury of false imprisonment" include "[b]y writ of *habeas corpus*." *Id*. at *128.  In his influential treatise on the common law, James Kent observed that "the common law of England, so far as it was applicable to our circumstances, was brought over by our ancestors, upon their emigration to this country."  2 Kent, Commentaries on American Law, p *27. He, too, described habeas as a means of vindicating "[t]he right of deliverance from all unlawful imprisonment." *Id*.

The common law recognized several forms of the writ.  The lesser forms included, most notably, the writs of habeas corpus *ad prosequendum*, *ad testificandum*, and *ad deliberandum*, which issue "when it is necessary to remove a prisoner, in order to prosecute or bear testimony in any court, or to be tried in the proper jurisdiction wherein the fact was committed."  3 Blackstone, p *130.  These writs remain available under MCL 600.4385 and are regulated by MCR 3.304.  See 4 Longhofer, Michigan Court Rules Practice (7th ed), § 3304.1, p 425.  "But the great and efficacious writ, in all manner of illegal confinement, is that of *habeas corpus ad subjiciendum*, directed to the person detaining another, and commanding him to produce the body of the prisoner . . . ."  3 Blackstone, p *131.  "The phrase 'habeas corpus' used alone refers to common-law writ of habeas corpus ad subjiciendum, known as the 'Great Writ.' "  39 CJS, Habeas Corpus, § 1, pp 327-328.  See also 39 Am Jur 2d, Habeas Corpus, § 2, p 218 (footnotes omitted).  This writ "established the basic right of freedom from unlawful detention." *Goetz*, 256 Mich at 567.  "The earliest colonists brought it to this country as a part of the common law, and it became, and ever since remained, the law of the land." *Id*.

This unqualified phrase "habeas corpus" appears throughout our law.  Most importantly, it is guaranteed by the Constitution:  "The privilege of the writ of habeas corpus shall not be suspended unless in case of rebellion or invasion the public safety may require it."  Const 1963, art 1, § 12.  The right is implemented statutorily by chapter 43 of the Revised Judicature Act,

MCL 600.4301 *et seq*. That said, "[t]he statute does not give the writ, but renders it more effectively and actively remedial"; its "main purpose . . . is to compel the performance of judicial and ministerial duties." *In re Jackson*, 15 Mich 417, 439 (1867) (opinion by COOLEY, J.). Consistent with that understanding, "[w]hen a statutory method of investigating the right to freedom is not provided, the common-law writ of habeas corpus is appropriate." *In re Denison*, 1 Blume Sup Ct Trans 319, 319 (1807).

Although the statute cannot limit the constitutional scope of the writ of habeas corpus, it guides how requests are processed and underscores the breadth of availability: "An action for habeas corpus to inquire into the cause of detention may be brought by or on the behalf of any person restrained of his liberty within this state under any pretense whatsoever," with certain inapplicable exceptions. MCL 600.4307. The Supreme Court has read that broadly: "Any person may make the application" for a writ of habeas corpus, for any person restrained. *Ex parte Mould*, 162 Mich 1, 7; 126 NW 1049 (1910). Michigan's habeas statute "differs from the original English statute, in not being confined to persons held under charges of crime"; rather, "the statute allows the writ, where the imprisonment or detention is '*under any pretense whatsoever*.' " *Jackson*, 15 Mich at 421 (opinion by CAMPBELL, J.). The statute also emphasizes the need for expeditious resolution: "Any court or judge empowered to grant the writ of habeas corpus shall, upon proper application, grant the preliminary writ (or an order to show cause) without delay, unless the party applying therefor is not entitled to the writ." MCL 600.4316. If issued, "the person on whom it is served shall bring the body of the person in his custody according to the command of the writ." MCL 600.4325.

The statute generally speaks in terms of a "prisoner." See MCL 600.4349 ("The court or judge issuing the writ of habeas corpus may commit the prisoner to the custody of such individual or individuals as the court or judge considers proper."). It defines "prisoner" as "the person on whose behalf the writ is issued, such as an inmate of a penal or mental institution, the child whose custody is sought, and other persons alleged to be restrained of their liberty." MCL 600.4322. The most familiar "prisoner" is a convicted person, but "[t]he term should in no way be taken to infer that the action is available only to those arrested on criminal charges." Longhofer, § 3303.1, p 396. Convicts generally are ineligible for habeas relief. MCL 600.4310(3). This reflects the "often repeated judicial declarations that habeas corpus cannot serve as a substitute for an appeal and cannot be used to review the merits of a criminal conviction." *People v Price*, 23 Mich App 663, 669; 179 NW2d 177 (1970). A narrow exception exists "where the convicting court was without jurisdiction to try the defendant for the crime in question," and even then "the jurisdictional defect [must] be radical," "render[ing] the conviction absolutely void." *Id*. at 669-670.

Court rules further implement the statute. Consistent with MCL 600.4307, "[a]n action for habeas corpus may be brought by the prisoner or by another person on the prisoner's behalf." MCR 3.303(B). Upon the filing of a complaint, the court may issue the writ or an order to show cause "unless it appears that the prisoner is not entitled to relief." MCR 3.303(D)(1). The trial court in this matter relied on this option under MCL 600.4316 and MCR 3.303(D)(1) to conclude that the chimpanzees are not "persons" eligible for habeas.

We agree with plaintiff that neither statute nor rule can narrow the constitutional decree. Under MCR 3.303(B), a habeas action "may be brought by the prisoner or by another person on the prisoner's behalf." And "[t]he word 'person' may extend and be applied to bodies politic and

corporate, as well as to individuals," MCL 8.3*l*, a principle we have applied to the court rules, see *Grand Rapids v Harper*, 32 Mich App 324, 328; 188 NW2d 668 (1971). Between this authority and cases like *Mould* that emphasized the universality of who may seek relief, plaintiff plainly qualifies as "another person" under MCR 3.303(B). The rule, however, requires that the action be brought "on the prisoner's behalf." To proceed, plaintiff must be acting on behalf of a "prisoner"—that is, a "person" with a cognizable interest in personal liberty. Because the writ must extend at least as broadly as the Constitution's incorporation of the common law requires, we must decide whether chimpanzees are "persons" who enjoy what Blackstone called a "right of personal liberty" that cannot be denied.

## B. AVAILABILITY OF HABEAS RELIEF

The central question then is who qualifies as a "person" capable of being "imprisoned" for purposes of habeas corpus. As explained above, the Michigan Constitution preserves "[t]he privilege of the writ of habeas corpus," Const 1963, art 1, § 12, but it provides no further detail beyond incorporating the common-law writ into the Constitution. Neither the Revised Judicature Act's habeas provisions nor the court rules provide further guidance that might assist us in resolving this case. In light of the general principle that the English common law remains in force in Michigan until it "expire[s] by [its] own limitation[] or [is] changed, amended, or repealed," Const 1963, art 3, § 7,[7] we look to that body of law to derive the legitimate scope of habeas relief. Cf. *People v Woolfolk*, 497 Mich 23, 26; 857 NW2d 524 (2014) ("[English] common law was adopted as the law of this state upon statehood and has since remained the law of this state.").

At common law, the category of "persons" was confined to human beings, and the law separately addressed the status of animals. Blackstone divided legal persons into "natural" and "artificial": "Natural persons are such as the God of nature formed us; artificial are such as are created and devised by human laws for the purposes of society and government, which are called corporations or bodies politic." 1 Blackstone, p *123. He further explained that "[t]he rights of persons considered in their natural capacities are also of two sorts, absolute and relative," with absolute rights being "such as appertain and belong to *particular men*." *Id.* (emphasis added). One such right was "natural liberty":

> The absolute rights of man, considered as a free agent, endowed with discernment to know good from evil, and with power of choosing those measures which appear to him to be most desirable, are usually summed up in one general appellation, and denominated the natural liberty of mankind. This natural liberty consists properly in a power of acting as one thinks fit, without any restraint or control, unless by the law of nature; being a right inherent in us by birth, and one of the gifts of God to man at his creation, when He endued him with the faculty of free will. [*Id.* at *125.]

---

[7] The effectiveness of the English common law until changed, amended, or repealed has been maintained since Michigan's statehood. See *Stout v Keyes*, 2 Doug 184, 188-189 (Mich, 1845); Const 1850, sched § 1; Const 1908, sched § 1.

Blackstone also recognized the social compact—"every man, when he enters into society, gives up a part of his natural liberty, as the price of so valuable a purchase; and, in consideration of receiving the advantages of mutual commerce, obliges himself to conform to those laws, which the community has thought proper to establish." *Id*.

As part of the same framework, the common law treated animals as objects of property. Blackstone defined property as "that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe." 2 Blackstone, p *2. Explaining the historical rationale for mankind's "dominion," Blackstone invoked the creation narrative to reflect the period's understanding of the common law's categories:

> In the beginning of the world, we are informed by holy writ, the all-bountiful Creator gave to man "dominion over all the earth; and over the fish of the sea, and over the fowl of the air, and over every living thing that moveth upon the earth." . . . The earth, therefore, and all things therein, are the general property of all mankind, exclusive of other beings, from the immediate gift of the Creator. [*Id*. at **2-3.]

From that premise, Blackstone concluded that, with respect to wild animals, "all mankind had by the original grant of the Creator a right to pursue and take any fowl or insect of the air, any fish or inhabitant of the waters, and any beast or reptile of the field: and this natural right still continues in every individual, unless where it is restrained by the civil laws of the country." *Id*. at *403.

Although Blackstone wrote as a commentator rather than a court, his account accords with judicial authority. English courts had long recognized that "[p]roperty qualified and possessory a man may have in those which are *feræ naturæ*," i.e., wild animals. *The Case of Swans*, 77 Eng Rep 435, 438; 7 Coke Rep 16 (KB, 1592). Kent echoed *The Case of Swans* in observing that "[a]nimals *feræ naturæ*, so long as they are reclaimed by the art and power of man, are also the subject of a qualified property"; "[w]hile this qualified property continues, it is as much under the protection of law as any other property, and every invasion of it is redressed in the same manner." 2 Kent, p *348.[8] One of the most famous American cases, *Pierson v Post*, 3 Cai 175, 178 (NY Sup Ct, 1805), likewise held that "encompassing and securing [wild] animals with nets and toils, or otherwise intercepting them in such a manner as to deprive them of their natural liberty, and

---

[8] The property was "qualified" because "if they do attain to their natural liberty, . . . the property is lost." *Swans*, 77 Eng Rep at 438. See also Kent, p *348 ("If an animal . . . belongs to the class of animals which are wild by nature, and owe all their temporary docility to the discipline of man, such as deer, fish, and several kind of fowl, then the animal is a subject of qualified property, and which continues so long only as the tameness and dominion remain."). This was as contrasted with domesticated animals, in which the property interest was "absolute."

render escape impossible, may justly be deemed to give possession of them to those persons who . . . have used such means of apprehending them."[9]

Michigan decisions track that understanding. The Supreme Court has recognized that "by the law of nature every man, of whatever rank or station, has an equal right of taking, for his own use, all creatures fit for food that are wild by nature, so long as they do no injury to another's rights." *Sterling v Jackson*, 69 Mich 488, 496; 37 NW 845 (1888). While *Sterling* spoke in terms of animals "fit for food," that phrasing reflected the issue in dispute. The Court has more broadly observed that "[i]t is settled in this State that dogs . . . are the property of the owner *as much as any other animal which one may have or keep*." *Ten Hopen v Walker*, 96 Mich 236, 239; 55 NW 657 (1893) (emphasis added).

Plaintiff's analogies to habeas proceedings involving women or enslaved persons do not alter this landscape. Plaintiff cites no authority suggesting that women were not "persons" at common law.[10] The slavery analogy cuts the other way: The atrocity of slavery was that the law permitted *persons* to be treated as property. Blackstone observed that the origins of slavery were "built upon false foundations" and that "the law of England abhors, and will not endure the existence of, slavery within this nation." 2 Blackstone, pp **423, 424. Those episodes reflect failures to honor human personhood, not expansions of it beyond the human species. The Constitution itself underscored both points. In describing the original formula for apportioning seats in the House of Representatives, it provided that each state's share would be "be determined by adding to the whole Number of *free Persons* . . . three fifths of *all other Persons*." US Const, art I, § 2, cl 3 (emphasis added). The reference to "all other Persons" was a reference to enslaved persons—textual recognition of their personhood—and "free Persons" plainly included women. When plaintiff sought a writ of habeas corpus on behalf of an elephant, the court rejected the dissent's argument that the common law's expansion of habeas to "abused women and children and enslaved persons" logically extends to animals, calling it "an odious comparison with concerning implications." *Nonhuman Rights Project, Inc v Breheny*, 38 NY3d 555, 571; 197 NE3d 921 (2022) (cross-reference omitted).

Plaintiff's argument that the trial court should have at least issued an order to show cause is unpersuasive. On the face of the complaint, the chimpanzees at defendants' zoo are not eligible for habeas relief. They are not "persons" possessing the "personal liberty" interest that habeas vindicates. They are not analogous to slaves or women—both categories comprised human beings recognized as "persons" in our legal tradition. Rather, the chimpanzees are animals, and as the common law authorities all make clear, animals—including wild animals, such as these chimpanzees—are treated as property. No exception exists for "intelligent" animals, which in any event has no natural stopping point—"[e]ven a dog distinguishes between being stumbled over

---

[9] The decision involved "poring over *Justinian*, *Fleta*, *Bracton*, *Puffendorf*, *Locke*, *Barbeyrac*, [and] *Blackstone*," *Pierson*, 3 Cai at 180 (Livingston, J., dissenting), and drew fine distinctions about when a person developed a property interest in an animal.

[10] Indeed, plaintiff's principal "authority" on this point, *Nonhuman Rights Project, Inc v Breheny*, 38 NY3d 555; 197 NE3d 921 (2022), is a dissent that expressly notes that "wives and children" were "not chattel." *Id*. at 589 (Wilson, J., dissenting).

-12-

and being kicked." Holmes, *The Common Law* (Boston: Little, Brown, & Co, 1881), p 3. The trial court did not err in summarily denying the petition.

## C.  CHANGING THE COMMON LAW

Plaintiff also contends that, even if the present state of the common law does not permit habeas relief for chimpanzees, the trial court should have entertained whether to update the common law to reflect evolving views. That argument misstates the trial court's role and, on the merits, offers no persuasive basis for change.

As explained, Michigan law treats captured animals as property, not persons. Lower courts may not disregard that established rule.

> The obvious reason for this is the fundamental principle that only [the Supreme] Court has the authority to overrule one of its prior decisions. Until [it] does so, all lower courts and tribunals are bound by that prior decision and must follow it even if they believe that it was wrongly decided or has become obsolete. [*Paige v Sterling Hts*, 476 Mich 495, 524; 720 NW2d 219 (2006).]

The Supreme Court is the "principal steward of Michigan's common law." *Henry v Dow Chem Co*, 473 Mich 63, 83; 701 NW2d 684 (2005). And "such a significant departure from Michigan law should only come from our Supreme Court, not an intermediate appellate court." *Teel v Meredith*, 284 Mich App 660, 666; 774 NW2d 527 (2009). Neither the trial court nor this Court may disregard *Sterling* or *Ten Hopen* by inventing a heretofore unrecognized exception for "intelligent" wild animals. See also *Nonhuman Rights Project, Inc v Stanley*, 49 Misc 3d 746, 772; 16 NYS 3d 898 (NY Co Ct, 2015) (denying habeas relief on similar grounds).

Nor is there a compelling rationale for such an exception. Plaintiff's theory misunderstands the interest habeas vindicates. Blackstone described the writ's original rationale as the sovereign's entitlement to an account of any restraint on the liberty of his subjects: "the king is at all times entitled to have an account, why the liberty of any of his subjects is restrained, wherever that restraint may be inflicted." 3 Blackstone, p *131. Under our form of government, the sovereign is not personified in the form of a monarch, and instead "[a]ll political power is inherent in the people," Const 1963, art 1, § 1, but the distinction is immaterial for these purposes. Animals simply are not members of the political community. "To make Covenant with bruit Beasts, is impossible; because not understanding our speech, they understand not, . . . and without mutuall acceptation, there is no Covenant." Hobbes, *Leviathan* (Richard Tuck ed, rev student ed) (Cambridge: University Press, 1996), p 97.

A central aspect of personhood is mankind's capacity to "give[] up a part of his natural liberty" and oblige[] himself to conform to those laws, which the community has thought proper to establish." 1 Blackstone, p *125. Chimpanzees—and nonhuman animals generally—are incapable of making this exchange. "Unlike the human species, which has the capacity to accept social responsibilities and legal duties, nonhuman animals cannot—neither individually nor collectively—be held legally accountable or required to fulfill obligations imposed by law." *Breheny*, 38 NY3d at 572. Reflecting that distinction, courts have uniformly declined to extend habeas to animals. See *Nonhuman Rights Project, Inc v Lavery*, 152 AD3d 73, 78; 54 NYS3d 392

(2017) ("[H]abeas relief has never been found applicable to any animals."); *Nonhuman Rights Project, Inc v Cheyenne Mountain Zoological Society*, 562 P3d 63, 70; 2025 CO 3 (Colo, 2025) ("[N]o Colorado court, nor any other court in any other jurisdiction in the United States has ever recognized the legal 'personhood' of any nonhuman species."); *Nonhuman Rights Project, Inc v R.W. Commerford & Sons, Inc*, 192 Conn App 36, 45 (2019) ("Our examination of our habeas corpus jurisprudence, which is in accord with the federal habeas statutes and English common law reveals no indication that habeas corpus relief was ever intended to apply to a nonhuman animal, irrespective of the animal's purported autonomous characteristics." (citation omitted)). We see no reason to question the uniform authority that animals are not persons who are eligible for a writ of habeas corpus.

## V. CONCLUSION

Plaintiff seeks a novel application of a venerable remedy. In reviewing it, we are forced to settle an ongoing jurisdictional debate and conclude that a trial court's denial of a petition for a writ of habeas corpus is appealable as of right. On the merits, we hold that chimpanzees are not "persons" eligible for habeas relief. The trial court also correctly declined plaintiff's invitation to construe animals as "persons" in contravention of the common law; only our Supreme Court may revise that common law principle, and plaintiff's argument for doing so is in any event substantively unpersuasive. Because defendants' chimpanzees are not eligible for habeas relief, we affirm the trial court's denial of plaintiff's petition.

/s/ Matthew S. Ackerman
/s/ Brock A. Swartzle
/s/ Christopher M. Trebilcock